216 P.2d 707

WACKER et ux. v. PRICE et al.
No. 5114.

Supreme Court of Arizona.
April 3, 1950.

H. B. Walker and Marshall W. Haislip, of Phoenix, attorneys for appellants.

Hill, Robert, Hill & Price, of Phoenix, attorneys for appellees.

STANFORD, Justice.

Action was filed in the superior court by appellants to quiet title in them to Lot 8, Block 31, Grand Avenue Addition to the City of Phoenix, Arizona, on the theory that their lot was being encroached upon by the appellees (defendants) who owned lot 6 but believed that their property, after a survey was made, did not encroach upon lot 8.

The case was tried before the court without a jury, and judgment was rendered in favor of appellees, from which judgment the appellants have appealed to this court.

On May 16, 1944, one Ida Shaw, a widow, gave a warranty deed to these appellants to said lot 8. On February 1, 1945, appellees also received from said Ida Shaw a warranty deed for lot 6, block 31 of said Grand Avenue Addition. The corners of neither of said lots were established by the Grand Avenue Addition map and the dimensions were not established except that most of the lots south of a main street to the north were accepted by owners to be 50 feet in width and it is stipulated that said lots are 50 feet in width. In November, 1946, the appellees secured a building permit to build on said lot 6 and erected a six room modern brick residence thereon.

When the two lots were purchased by the respective grantees no buildings were upon them nor were there any fences or other signs showing the location of the lots, except to the south of lot 8 was lot 10 owned by Della C. Newcomb. She had a home upon the lot which was built approximately 20 inches south of the south line of lot 8 and her north line was designated by a fence. Della C. Newcomb bought the premises in 1915 and has lived there since. There was also constructed on lot 10 a garage at the southwest corner of the lot. There was also a fence along the south line of the Newcomb lot, and at the time of the trial it had been there for 20 years and she claimed that the size of her lot was 50 x 137½ feet. She also claimed that she had her lot surveyed by Holmquist and Robinson in the year 1919.

According to the map of Grand Avenue Addition, which was filed before the addition was taken into the City of Phoenix, (filed of record in 1887) the lots in block 31 alternate, that is to say, the even numbers are on the east side and the uneven numbers on the west side of the block.

Venus McGinnis testified that he owned lot 12 in block 31 and stated that there was a fence on the north side of his lot and on the south side there was a hedge of trees, and when asked how old the trees were he answered: "Ever since—I don't know, they have been there forever almost." He had two buildings upon his lot.

Chester Adams testified that he lived in the Grand Avenue Addition and that his lot was number 14; that he had lived there for 15 years, but that he did not build the house, it being there before he obtained it.

One of the maps submitted in evidence which shows the fences, hedges and houses upon the lots in blocks 30 and 31, shows a house on lot 16, block 31, but no testimony was offered concerning it.

As to lot 18, block 31, lying to the south of lot 16, the testimony shows it was owned by Louis Radonick and had been owned by him for 20 years; that he had a house upon it and a fence along the north and south sides, the fence having been there for 20 years. He had owned but sold lots 16 and 20, each of which, from the map referred to, have houses upon them.

The next lot owner to the south is Joseph Shaughenessy, who testified that he lived on lot 2, block 30, being south of block 31, for 35 years and had a lot of trees and a fence on the north side of his lot; that the fence had been there for 20 years and the trees five or six years; that he owned lots 22 and 24 in block 31, being to the north of his lot 2, but there is a street (Cedar Street) between lot 2, block 30 and lot 24, block 31. He testified that there was an iron stake in the north corner and there was a line of Tamarisk trees on the north boundary of lot 22. He also testified relative to these two lots: "We have a steel

stake in the ground at the corner of each lot on the north side and south side."

Appellants contend that appellees claimed an interest in lot 8 which lot appellants claim to own, and the interest was adverse to appellants and the testimony showed that the house constructed upon that portion of lot 8 owned by appellants was an encroachment of 17.20 feet on the east end, or front, of the house, and 16.83 feet on the west end, or rear of the house.

F. M. Holmquist, called as a witness for appellants, testified that he was a civil engineer and had been such since 1909; that he had made surveys of the lots in blocks 30 and 31 of Grand Avenue Addition, and at the request of the appellant had made a survey in January, 1947, of blocks 30 and 31 of Grand Avenue Addition, and the witness testified that he made reference to the original Grand Avenue map recorded in Book 1, page 9 of the records of the County Recorder of Maricopa County, Arizona. Referring to that particular map this question was asked the witness:

"Q. Is this map which counsel for the plaintiff has offered in evidence here, marked Plaintiffs' Exhibit 'C' for identification, does that show that lot lines as they are upon the official recorded map of this property? A. As near as you could tell, yes, sir. There may be some slight differences which just couldn't possibly be reconciled. In general they follow very closely.

"Q. You say it follows very closely? A. In general. As regards block 30, I don't know of any real differences—I mean block 31.

"Q. Block 31 you don't know of any real differences between this and the recorded map? A. That is right."

Harry E. Jones, civil engineer, was called as a witness for appellee and in testifying concerning lot 6 claimed by appellees, he said:

"Q. Now when you made this survey for lot 6 for Mr. Price, I suppose you did examine the ground down to the south part of Block 31? A. Oh, I have been aware of that situation out there for several years.

"Q. *When you prepared this map did you run into any stakes or markers at the corner of these other lots there in the south part of Block 31?* A. *No, sir, I didn't look for them.* I knew where I would find them, I knew they were there. I know Mr. Holmquist has been making surveys out there from those erroneously placed stakes for years.

"Q. And you told Mr. Price there were markers down there? A. We didn't discuss that; he didn't ask me and I didn't tell him. His lot was all in the clear, no encroachments on his lot, no adverse possession, no fences or anything.

"Q. Now on these other lots in that area, did you see these fences and these rows of trees, high trees 20 or 30 feet high? A. I have known of that area they own

here as I say for 42 years. I have been out there many times. I am thoroughly conversant with it.

"Q. And you have seen those trees for many years? A. Yes.

"Q. In your survey you totally ignored all those? A. *I wasn't requested to make a survey of property rights, just Lot 6, Block 31, which I did. Since there were no adverse claims or nothing that would indicate an adverse possession of that particular lot. We weren't interested any further."* (Emp. Sup.)

F. M. Holmquist, witness for appellants, under cross examination stated:

"Q. Now getting back to this official map, it has no measurements on it at all. A. No, sir.

"Q. Just state the scale, 300 feet to the inch? A. That is what it says on the map, yes, sir.

"Q. What is the distance shown on the official map from the south line of McDowell to the north line of—of what used to be Elm Street? A. No distance given.

"Q. Can you give us that distance by looking at the map? A. No, sir, not from this map. I don't have any other records here that would give that.

"Q. Those streets in there, what are those streets? A. Well, they are generally 60 feet. The map doesn't say that, but by collateral evidence they have been determined to be 60 feet.

"Q. And you have generally accepted them as being 60 feet? A. Yes, sir.

"Q. Now granting all these lots in Blocks 33 and 32 and 31 as shown on the official map are 50 foot lots and the streets are 60 feet in width, what is the distance from the northeast corner of that subdivision, 33 feet south of the north line of that quarter section, or the north line of that section, to the north line of Elm Street as shown on the map? A. From the section line or the south line of McDowell.

"Q. The south line of McDowell? A. Each block would be 600 feet, and two blocks would be 1200 feet, plus Madrona Street, would make about 1260 feet to the north line of Elm Street, based on 50 foot lots.

"Q. Then there would be 33 feet north of that line to the center of McDowell? A. Yes, sir.

"Q. Which is the north line of Section 6? A. Yes, sir, based on the assumption.

"Q. Are there any City monuments located along Fifteenth Avenue between McDowell and Roosevelt? A. Yes, sir.

"Q. Did you make any use of any of those monuments? A. I tied into them.

"Q. I didn't understand. A. We tied into them.

"Q. Did you make any use of any of the distances on the City map between those monuments? A. No, sir.

"Q. In determining where this line is? A. Not as a basis of the survey, no, sir."

It is the theory of the appellants that surveys having been made for a long period of time by competent surveyors that the unde-

termined distances in the Grand Avenue Addition have for many years been settled and that the lots in block 31 have been determined to have a width of 50 feet. When the house in question was built, it was built within a few feet of lot 10, block 31 owned by Mrs. Newcomb for over thirty years, and her north line, being the south line of lot 8, was well defined by a fence.

Carrying out the theory of appellants we quote from the case of Silsby & Co. v. Kinsley, 89 Vt. 263, 95 A. 634, 638: "The actual location upon the ground of original lot lines will control, if capable of being ascertained; but, when such lines have never been surveyed or, if surveyed, their location upon the ground cannot be ascertained, resort may be had to the lines of adjacent lots to determine their location."

When the appellees had their survey made they could see plainly that something was wrong because there was not enough distance between the south line of appellees' house now upon the premises, and the north line of Mrs. Newcomb's place lying to the south, for a 50 foot lot. Therefore it was easily observed that there was an error somewhere. The Newcomb place had open to view a hedge and fence upon it.

In this respect we quote from the quiet title case of Atwell v. Olson, 30 Wash.2d 179, 190 P.2d 783, 786: "* * * The Olsons had ample opportunity to observe all improvements lying south of the hedge. They may not now be heard to say that they failed to see that which was plainly visible and which could have been ascertained upon inquiry. * * *"

The testimony in this case clearly shows that the lots involved in this litigation were conveyed with respect to and in accordance with the map and plat of the original Grand Avenue subdivision recorded in the office of the County Recorder September 13, 1888. It further appears from the evidence that the monuments from which the original survey was made cannot be accurately located. The evidence does show definitely, however, that parties who purchased lots in this subdivision erected homes, established boundary lines between lots in block 31 where the property involved here is located by building fences and planting trees which have been in existence and recognized by all the property owners and their predecessors in interest ranging from 20 years to 35 years. The exact date when these various fences and trees marking the boundary lines between lots in this block is more or less indefinite, none of which, however, appear to have been less than 20 years.

Based upon the rule of reason it would appear to us that where a situation like this obtains the boundary lines between the various lots in the subdivision as established by the parties themselves must control in determining the boundary thereof. Every lot in block 31 south of lots 6 and 8 here involved have definite boundaries established by acquiescence of the parties for a

much longer period than is required to establish title by adverse possession.

In 110 American State Reports, page 681, under the title of "Resurveys and their Purpose and Effect", the following is found: " * * * In Diehl v. Zanger, 39 Mich. 601, where the first survey of lots involved in litigation was made by one Campau, and a resurvey made years afterward by the city surveyor showed that the practical location of the whole plat was wrong, it was declared that a resurvey, made after the disappearance of the monuments of the original survey, *is for the purpose of determining where they were, and not where they should have been,* and that a long-established fence is better evidence of actual boundaries settled by practical location than any survey made after the monuments of the original survey have disappeared. 'Nothing is better understood,' said Justice Cooley in delivering the opinion of the court, 'than that few of our early plats will stand the test of a careful and accurate survey without disclosing errors. This is as true of the government surveys as of any others, and if all the lines were now subject to correction on new surveys, the confusion of lines and titles that would follow would cause consternation in many communities. Indeed, the mischiefs that must follow would be simply incalculable, and the visitation of the surveyor might well be set down as a great public calamity. But no law can sanction this course. The (city) surveyor has mistaken entirely the point to which his attention should have been directed. The question is not how an entirely accurate survey would locate these lots, but how the original stakes located them. * * * The city surveyor should, therefore, have directed his attention to the ascertainment of the actual location of the original landmarks set by Mr. Campau, and when those were discovered they must govern. If they are no longer discoverable, the question is where they were located; and upon that question the best possible evidence is usually found in the practical location of the lines, made at a time when the original monuments were presumably in existence and probably well known: Stewart v. Carleton, 31 Mich. 270. As between old boundary fences and any survey made after the monuments have disappeared, the fences are by far the better evidence of what the lines of a lot actually are.' * * * "

In 22 American State Reports, Ancient Boundaries, page 35, we find the following: " * * * For the purpose of establishing ancient boundaries, by locating calls for corners, etc., the declarations of the parties in interest, or those who assisted in making the old survey, are admissible, when such persons are unable to testify orally or by deposition, by reason of sickness or death: Whitman v. Haywood, 77 Tex. 557, 14 S.W. 166; Griffith v. Sauls, 77 Tex. 630, 14 S.W. 230. Ancient fences, used by a surveyor in his attempt to reproduce an old survey, are strong evidence of the location of the original lines, and if they have been

standing for many years, should be taken as indicating such lines, even against the evidence of a survey ignoring such fences, based upon an assumed starting-point: Beaubien v. Kellogg, 69 Mich. 333, 37 N.W. 691, for it will not do to allow boundaries to be disturbed upon a survey made from an assumed starting-point, without proof of its being a true line, located and fixed by the original survey. * * *"

In the case of Veve y Diaz v. Sanchez, 226 U.S. 234, 33 S.Ct. 36, 57 L.Ed. 201, in a plat of Bello Sitio made in 1907 showing that it contained 415 cuerdas and a mortgage was given upon 400 cuerdas in the subdivision and action was brought upon it and the defendant claimed that 134 of the lots or cuerdas supposed to be within the subdivision were in fact not in it and that only 279 were left and that the shortage was due to encroachments by adjoining land owners, it seems that in making the survey of the subdivision the surveyor made it by following ditches, fences, trees, stakes and the documents of adjoining land owners, all of whom were present when the surveys were made and assented to its correctness. The land owners were also examined as witnesses. Some of them had owned the property from the date of the mortgage and others for a shorter time, but all testified that they knew of no change in the lines. The boundaries as fixed by the survey were upheld by the Supreme Court of the United States.

Applying these principles to the instant case the grantor, Mrs. Shaw, conveyed lot 8 to the plaintiff Wacker and lot 6 to the defendant Price, true the boundary between the grantees was not by express grant designated by Mrs. Shaw, the grantor, but she did convey lots 6 and 8 with reference to the north boundary line of lot 10 owned by Mrs. Newcomb since 1913, which north boundary line had been established for at least 30 years and conformed with all of the other boundary lines between the other lots in the block south of her as fixed and acquiesced in by the property owners thereof. Therefore Mrs. Shaw in conveying lots 6 and 8 of the Grand Avenue subdivision to the City of Phoenix conveyed said lots with reference to said boundary line as fixed by the property owners in said block. And since it has been stipulated that the lots in block 31 are 50 feet in width the grantees took said conveyances with such monuments as have been established by the property owners and their predecessors in interest in block 31 by implied agreement and acquiescence over a period of years.

As was said in the Oregon case, Trotter v. Stayton, 41 Or. 117, 68 P. 3; Diehl v. Zanger, 39 Mich. 601, that it is a matter of common knowledge that the great majority of original surveys are more or less inaccurate and since it has always been the rule that courts must resort and be bound by the best evidence available, it follows that the boundaries fixed by the

property owners themselves in the absence of the inability of surveyors to definitely fix the monuments from which the original survey was made must control and that the city surveyor nor any other surveyor has any authority to establish new boundaries which must of necessity affect the property rights of all property owners concerned where they cannot establish title by adverse possession.

 The recent survey of this property for the purpose of trial made by F. M. Holmquist, civil engineer, shows a part of the house constructed by appellees to be located upon the property of appellants. Under all of the circumstances it is plain to this court that it should apply its equity powers in order to be fair to all of these litigants. We hold that lot 8 according to the survey of Grand Avenue Addition, being a lot 50 feet in width lying next north of the fence, or the hedge of Mrs. Newcomb, the owner of lot 10, is the property of appellants. The court therefore reverses the judgment and remands the case to the trial court with instructions to take testimony as to what portion of lot 8 appellees will require for a reasonable enjoyment of the improvements constructed thereon and to fix the damages suffered by appellants as a result of the wrongful taking of said property based upon a fair market value of lot 8 at the date of taking and the portion thereof required by appellees for the proper enjoyment of their improvements thereon and what damage, if any, has been done to the remaining portion of said lot 8, and require appellees to pay appellants the determined value for the space to be taken and damage, if any, as above mentioned. If appellants do not choose to accept same, then permit the appellees to pay appellants the determined value of the whole of lot 8 as fixed by the trial court and take title thereto, but should the appellees decline to pay to appellant the amount fixed, then the court shall enter judgment quieting title to lot 8, described as a lot 50 feet in width adjacent to lot 10, block 31, Grand Avenue Addition and immediately north of the north side line of said lot 10, in appellants in accordance with the prayer of their complaint. Appellants to recover their costs in the trial court and on this appeal.

LaPRADE, J., concurs.

PHELPS, Justice (specially concurring).

I concur in the result of the opinion of Justice Stanford in this matter but desire to more fully state my reasons therefor.

So far as the evidence in this case discloses there was never made an actual survey of Grand Avenue Addition, and certainly none that a survey was ever made with reference to a governmental monument at McDowell Road and 15th Avenue. The map or plat thereof as filed in the office of the county recorder on May 28, 1887 is shown to have been prepared by a draughtsman. Later, on September 18, 1888, another map or plat of said subdivision was recorded. Both maps or plats are

referred to in the evidence as official plats although plaintiff admits that the latter plat is the official plat. The legend indicates that the plats are drawn to a scale of 300 feet to the inch. The width of lots and streets are not designated in the plat. It seems to be agreed by all the parties to this litigation, however, that the lots were intended as 50-foot lots and the streets 60 feet in width.

The court will take judicial notice of the fact that at the time the Grand Avenue Subdivision was platted the limits of the city of Phoenix extended west only to what is now Seventh Avenue between Jackson and Van Buren Streets known as the original townsite of the city of Phoenix, and all of the territory now embraced in Grand Avenue Subdivision north and east of Grand Avenue was desert, covered in large measure by mesquite. This condition obtained, according to the testimony of the witness Shaughnessey in this case, until as late as 1911 and 15th Avenue had not been opened at that time.

Apparently when lots were begun to be sold and homes constructed thereon it was necessary to have a survey made upon the ground to establish the location of the lot or lots purchased. The evidence shows that as early as 1919 Fritz Holmquist, one of the witnesses in this case and a competent civil engineer was called upon frequently to make these surveys and actually made said surveys and placed wooden or iron stakes at the corners of most of the lots on the east side of Block 31 of said subdivision. He was not questioned about whether he participated in surveys on the west side of said block but did say that he had made surveys in a number of blocks in that subdivision over a period of many years.

In any event homes were constructed, fences built and trees planted along the side lines of all of said lots to the south of Lots 8 and 6, Block 31, in accordance with said surveys. Only Lots 8, 6, 4 and 2 on the east side of Block 31 were vacant at the time the parties hereto purchased Lots 8 and 6 from a Mrs. Shaw. In Block 31 both on the east and west sides of said Block, property lines between all the lots except Lots 8, 6, 4 and 2 are marked by fences or trees which have been in existence over a long period of years. It is 207.5 feet from the north line of Lot 10 to the south line of the present alley located where Elm Street was shown on the original plat. This footage was sufficient to give to the purchasers of each of the four lots all the frontage they purchased and all the frontage they were entitled to under the law. Be it remembered that at the time Elm Street was abandoned the law did not give to the adjacent property owners the abandoned area as it now does. If appellee should prevail in this litigation the effect would be to reduce the width of appellant's lot approximately 30 feet, and to increase the frontage to the lot adjacent to the alley the same number of feet.

Elm Street above mentioned was immediately north of Lot 2 according to the map or plat of Grand Avenue Subdivision. In 1930 the board of supervisors of Maricopa County by resolution purported to abandon said street except the north 20 feet thereof which it reserved for an alley. An examination of the original map or plat of Grand Avenue Subdivision shows that Ash Street, now Roosevelt Street, marked the south boundary of said subdivision; that it crosses Grand Avenue and continues straight east without the slightest offset in the side lines thereof, and presumably exists today as it was designated at that time. At least there is no evidence to the contrary. The plat further shows that Cedar Street which lies one block north and immediately south of Block 31, if projected, the side lines thereof would be superimposed upon the side lines of Magnolia Street to the west of Grand Avenue.

The side lines of all lots south of Lots 8 and 6, Block 31, on the east side thereof have been established by common consent and title vested thereto in the respective owners by adverse possession, and the evidence concerning side lines of lots on the west side of said Block seem to indicate a like condition. A comparison of these property lines with the original plat, the city map, and Plat E of the F. Q. Story Addition will reveal these property lines are in practical conformity with the original plat.

While it is true that public officials are presumed to act in conformity with ordinances or resolutions passed by them, it does not necessarily follow that because the resolution of the board of supervisors providing that Elm Street should be abandoned except the north 20 feet thereof preserved for an alley, the south portion rather than the north portion thereof was actually abandoned. Striking proof of that fact is evidenced by the case of Calhoun v. George D. Moore, et al., not yet reported, where the board of supervisors by resolution provided for the opening of a road on the half-section line on 23rd Avenue between Indian School Road and Campbell Avenue in this county whereas in fact at that point the road veered 53 feet to the west of the half-section line and has been so used for more than thirty years.

Let it be conceded that the city survey and the Jones survey are accurate surveys of the area according to the Governmental monument located at McDowell Road and 15th Avenue. We must remember that we are not here concerned with an accurate survey of this particular area. We are concerned only with accurately ascertaining, if we can, the location of the boundary lines of Grand Avenue Subdivision according to the original plat thereof and the boundary lines of the lots and streets shown by said map or plat. It matters not how inaccurate the plat may have been or may be, property rights have vested according to that map or plat. No surveyor whether he be acting on behalf of the city or anyone else has the right to arbitrarily change

property lines or move streets from the location established by the original map or plat. The city surveyor who prepared the so-called official map of the city of Phoenix and the witness Jones wholly misconceived their duty in making their surveys of this area. The function of a surveyor in a case of this kind is not to determine where the streets or the lot lines in the subdivisions should have been according to an accurate survey but to determine where they actually were, measured by the original map or plat of Grand Avenue Subdivision. In the case of Diehl v. Zanger, 39 Mich. 601, the court said that a long-established fence is better evidence of actual boundaries settled by practical location than any survey made after the monuments of the original survey have disappeared. That certainly would apply where no survey appears to have been made as in this case and especially where said fences for all practical purposes conform with the original plat. Justice Cooley in a concurring opinion in that case said:

"Nothing is better understood than that few of our early plats will stand the test of a careful and accurate survey without disclosing errors. * * * The (city) surveyor has mistaken entirely the point to which his attention should have been directed. The question is not how an entirely accurate survey would locate these lots, but how the original stakes located them. * * * The city surveyor should, therefore, have directed his attention to the ascertainment of the actual location of the original landmarks set by Mr. Campau, and when those were discovered they must govern. If they are no longer discoverable, the question is where they were located; and upon that question the best possible evidence is usually found in the practical location of the lines, made at a time when the original monuments were presumably in existence and probably well known: Stewart v. Carleton, 31 Mich. 270. As between old boundary fences, and any survey made after the monuments have disappeared, the fences are by far the better evidence of what the lines of a lot actually are. * *."

The above statement of Justice Cooley is particularly apropos in the instant case. Nothing appears on the original plat to indicate either the width of lots or of streets. No governmental monuments are indicated. There is no evidence in this record that any measurement was ever taken from the Governmental monument at the intersection of McDowell and 15th Avenue in platting Grand Avenue Subdivision. There can be no justification in doing so at this time. At the time the subdivision was platted no law existed in the territory of Arizona prescribing the steps to be taken in laying out subdivisions to towns or cities. The only statute in existence at the time remotely relating to such matters was Chapter 2, section 169, Revised Statutes of Arizona of 1887 adopted in April, 1887, providing for the *platting of towns on public lands* and for dedication of streets and alleys by filing a plat thereof with the board of supervisors.

That statute was not applicable either to platting private property or to subdivisions and therefore has no application to the instant case but it is probably that it was used as a pattern in subdividing Grand Avenue Subdivision and it is further probable that the draughtsman never checked the plat with actual measurements or monuments. Under such circumstances it is easy to account for the inaccuracy of the plat with reference to Governmental monuments. Aristotle said: "We should seek such certitude in each thing as the nature of that thing allows." This is simply a concise statement of the "best evidence rule" adopted by the courts of this country in the ascertainment of certain facts upon which they can predicate judgments.

Bearing in mind that there is no evidence that an actual survey was ever made of Grand Avenue Subdivision or that any actual measurements were ever made from the Government monument at the intersection of 15th Avenue and McDowell Road and that our sole concern here is to determine if we can from the best evidence available what actually was the location of the lots in question as fixed by the plat of the Grand Avenue Subdivision, we are forced to the conclusion that their location is to be determined if at all from well-established long-standing monuments existing within the subdivision itself.

What is the best evidence in this case? Certainly the Government monument at McDowell Road cannot be treated as the best evidence of a starting point from which the actual location of the lots here involved may be accurately determined for the reason that there is no evidence that such monument was ever used as a starting point, in platting Grand Avenue Subdivision. On the other hand so far as the evidence discloses Cedar Street as it exists today is located exactly where the plat of the Grand Avenue Subdivision places it. It certainly is located exactly where the property owners in Blocks 31 and 32 by common consent have placed it since it was opened for use, some time after 1911. As stated above, if the side lines of Cedar Street were projected west they would be superimposed upon the side lines of Magnolia Street and vice versa. That is where the original plat places it. The extended side lines of a street constitute in law a permanent monument. Carey v. Clark, 40 Nev. 151, 161 P. 713. Therefore the side lines of Cedar Street are in legal effect a permanent monument in Grand Avenue Subdivision from which the location of lots in Block 31 may be definitely determined. In fact, under the best evidence rule it is the only monument from which the location of said lots according to the Grand Avenue Subdivision plat can be made. The accuracy of this monument has been confirmed by acquiescence by all of the property owners in Block 31 except Lots 8, 6, 4 and 2 thereof, and all of the property owners in Block 30 to the south of Cedar Street. This acquiescence is

clearly evidenced by location of homes on such lots and the building of fences and growing of trees along the side lines thereof for a long period of years far in excess of the statutory period required to acquire title by adverse possession. This is true as to lots on both the east and west side of Block 31 and especially directly west of Lots 8 and 6. These things were clearly visible to both parties to this litigation when they purchased the lots from Shaw. The fences along the side lines of the lots themselves may be treated as monuments. Perich v. Maurer, et al., 29 Cal.App. 293, 155 P. 471. It was said in Ralston v. Dwiggins, 115 Kan. 842, 225 P. 343, 344, that where a survey appears to conform with the recognized boundary lines of city lots on which buildings have been erected and expensive improvements made the boundaries so generally accepted and recognized for many years lend some support to the survey approved by the court; citing Tarpenning v. Cannon, 28 Kan. 665. The surveyor in that case testified that if the appellant's theory was adopted "it would move every existing improvement in town 6 feet." If appellee's survey is accepted it will move every lot line in Blocks 30 and 31 Grand Avenue Subdivision south approximately 25 to 30 feet. Such a result would be disastrous to all of said property owners were it not for the fact that they have all acquired title to the property actually occupied by them by adverse possession. The court in the Ralston case,

supra, further said: " 'The primary rules for locating city plats upon the ground are, in order of precedence in application, as follow: (1) Find the lines actually run and the corners and monuments actually established by the original survey. (2) Run lines from known, established or acknowledged corners and monuments of the original survey. (3) Run lines according to courses and distances marked on the plat.' " citing In re Richardson, 74 Kan. 557, 87 P. 678. The court further said in that opinion: "It is urged that the section line was the proper base line which the surveyor should have ascertained and from which his measurements and calculations should have been made. That leaves out of consideration the original survey as actually located upon the ground. A certain hedge fence is spoken of as having been used as a base line in early days, but time has erased that mark. The monuments and marks found by the surveyor furnished reasonably good evidence in locating the original survey. * * *."

We have conceded that Grand Avenue Subdivision was not accurately platted but we are bound by that plat as we find it and not by what it should be if accurately platted. We are bound by the best evidence rule which must be held to be the monuments established by the plat itself, acquiesced in and confirmed by the property owners in Block 31 as evidenced by long-established property lines.

It follows that the location of Lots 8 and 6 must be determined in accordance with the best evidence rule, that is, by measurements from monuments irrefutably established by the original plat itself as confirmed by the property owners of Block 31.

The findings of the trial court are not supported by substantial evidence. The judgment of the court should therefore be reversed and the cause remanded to that court for the purpose of determining the amount of the damage suffered by appellant, in the manner specified in Justice STANFORD'S opinion.

UDALL, Justice, (dissenting).

We consider that the decision of the majority not only does a gross injustice to the appellees but the principles of law applied to this situation, if followed, will work mischief with land titles generally. We completely disagree with both the majority opinion and the specially concurring opinion of our associates. The majority, as we view it, have by their rejection of what the trial court considered and what we deem to be the true control point, to wit: the quarter section corner on the north line of section 6, "ridden off in all directions". They are, in our opinion, like a ship at sea without rudder or compass.

The author of the majority opinion maintains that Ida Shaw (the common grantor of the parties) conveyed said lots " * * * with reference to the north boundary line of lot 10 owned by Mrs. Newcomb * * *" which boundary had become established by acquiescence in an old fence line. On the other hand the author of the concurring opinion maintains that " * * * the side lines of Cedar Street * * *" constitute the proper control monument. (Cedar Street—one block in length—while shown on the original plat of 1888 was not opened for use until the year 1911.) We maintain that both statements are predicated upon erroneous assumptions. As a matter of fact the Ida Shaw deeds in evidence specifically state, as to the description, that the conveyance is made with reference to the plat of the Grand Avenue Addition on record in the office of the County Recorder of Maricopa County, Book 1 of Maps, page 9. Later we shall endeavor to point out in more detail the incorrectness of these assumptions and show that the government monument, supra, should be accepted as the control point for an accurate survey. Before doing this, however, there are some general observations that may well be made.

At the outset we call attention to the fact that the sole issue involved in this case is, "Where upon the ground is the true boundary line between lots 6 and 8 of block 31, Grand Avenue Addition" ? Is it 1503 feet south of the northeast corner of the quarter section corner, as contended by appellees and as found by the court, or is it 27.35 feet north of that point, as claimed by the appellants? The only par-

114

ties interested in this disputed boundary line are the appellants (plaintiffs), the record owners of lot 8, and appellees (defendants) who hold title to lot 6. The judgment of the trial court was strictly confined to a determination of this issue. This judgment, had it been permitted to stand, would not have upset incorrect boundary lines between lots owned by various other parties in the neighborhood. As between property owners to the south and the west of the lots in question, acquiescence in boundary lines or adverse possession might well be the determining factor. In any event their rights are not before us for determination in this proceeding. It is our opinion that if Ida Shaw, appellants' grantor, lost title to the south portion—actually 27.35 ft.—of lot 8 it was because of the adverse claims of appellants' neighbor on the south (Mrs. Newcomb) and not by reason of any deficiency or shortage of land in said lot 8. None of the elements of adverse possession are present as between the parties in the instant suit. It would appear appellants' remedy was to sue their grantor on her warranty rather than trying to shift to the north the true boundary lines between lots 2, 4 and 6. The trial court found (and there is no evidence to the contrary): "That there were no fences, monuments or other visible markings either along the (true) boundary line between said lots 6 and 8 * * * or along the line claimed by the plaintiffs to be the boundary between said lots at the time either the plaintiffs or defendants acquired their respective lots."

We emphatically disagree with the statement in the concurring opinion to the effect that there was 207.5 feet from the north line of lot 10 to the south line of the present alley—originally a part of abandoned Elm Street—which was sufficient to give the owners of lots 8, 6, 4 and 2 each a fifty foot frontage. It is our view that the lot lines in question became fixed with the filing of the original Grand Avenue Addition plat and thereafter were immutable. The fortuitous circumstance of the abandoning of Elm Street by the board of supervisors in the year 1930—nearly a half century after the subdivision was platted—can have no bearing upon the present controversy. It certainly is a novel suggestion that the closing of a street ipso facto shifts boundary lines of lots in the area. It is to be noted that no authority is cited in support of this proposition.

We believe that the following criticism may be justly leveled at the opinions of the majority. They have in this instance, unwittingly perhaps, set themselves up as the triers of the fact. Certainly throughout they have ignored the seventeen findings of the trial court and have stated the facts in a light most favorable to an overthrowing rather than a sustaining of the judgment as well as indulged in a goodly number of unwarranted assumptions. We consider these serious departures from well

settled rules heretofore scrupulously followed by this and all other appellate courts. Estate of Taylor, 56 Ariz. 211, 106 P.2d 492.

It cannot be gainsaid that there is an irreconcilable conflict between the Holmquist survey of the area in question and the numerous other surveys thereof shown by the maps in evidence. The reason for this is obvious as different yardsticks were used. On the one hand the following surveys, to wit: (a) the Turney Map of the area (coprighted in 1908); (b) the junior subdivision known as the "F. Q. Storey Addition Plat E" (1927), covering the northeast portion of the original Grand Avenue Addition; (c) the survey made in connection with the abandonment by the board of supervisors of Elm Street (1930) and the establishment of a twenty foot alley on the north portion of said abandoned street; (d) the official map of the city of Phoenix (1938) of this subdivision (following closely the Turney map) upon which the city bases all of its paving, street lines, lot lines and assessments; and (e) the Jones survey made for the appellees, all unquestionably accept the same control point on the township line, to wit: the quarter section corner on the north line of section 6. Hence these surveys completely square one with the other. This fact is to us most significant, bringing, as we believe, irrefutable proof that the original subdivision map in 1888 was also laid out from the same control point. On the other hand

Engineer Holmquist elected to ignore such monument, taking in lieu thereof his own previously established control points. In other words he made a survey of the lots as he found them to exist on the ground and not as they were deeded according to the original plat. Excerpts from his testimony will, we believe, make this point crystal clear. First as to the non-use by Holmquist of the quarter section corner as a starting point he testified on cross examination:

"Q. Now Mr. Holmquist, can you state —and I will ask you this question again— can you tell us whether or not your survey of these two blocks, 30 and 31, Grand Avenue Addition, which was shown on this exhibit, Plaintiffs' Exhibit 'C' in evidence, started from any of the quarter section corners of the Northwest Quarter of this Section 6? A. The east line of the quarter section was used as the east boundary of the block; *otherwise it wasn't passed on any certain distances from any of these corners.* (emphasis supplied)

Next as to the map (Exhibit "D") prepared by him which was primarily relied upon to establish the lot lines as contended for by appellants, we find this most revealing statement:

"Q. * * * Now tell the Court in a little greater detail as to just how you found—and upon which you based your survey as is shown by—reflected by this map. A. Well, during a number of years

I have been called on to make surveys in that portion of Grand Avenue Addition, not only these two blocks, (30 and 31) but blocks to the west. There has been a map prepared by Mr. Turney that I worked for years ago, I had a copy of that map, and I found out on investigation that that map didn't fit conditions at all, if we attempted to make surveys by that map—

"Mr. Hill: We object to this as not being responsive. The question is where did he begin from to make this survey?

"The Court: Just answer the question.

"A. I made investigations and made preliminary sketches of the map *to determine as near as possible where the lot line should be to fit fences that existed, and lines of evidence of where the lot lines were, by occupancy and so on,* and altogether it has resulted in this map, as far as these two blocks are concerned, based on what we (call) collateral evidence, * * *

"Q. Tell the different monuments that you found and used as part of your survey in determining this lot 8? A. To start with, there weren't any real monuments. The monuments were—part of them were put in by me. I don't recall these two particular blocks, *but as I would complete a survey and determine where I thought the line should be,* we would put in—we would mark points out in the middle of the street with an iron pipe, and call it a survey monument, and when we would make another survey we have base additional surveys on the same monuments." (emphasis supplied)

The Holmquist survey map has no official standing, it has never been approved by either the county board of supervisors or the city of Phoenix, nor is it filed for record with the County Recorder. It is admittedly an arbitrary plat showing conditions as *he claims they exist upon the ground.* It is our view that the original plat of the Grand Avenue Addition is controlling and not some unauthorized junior survey. We take it to be the settled law of this state that a survey based upon governmental monuments controls over one based upon unknown or private monuments. Galbraith v. Parker, 17 Ariz. 369, 153 P. 283.

Finally as to the origin of the iron stakes shown upon the Holmquist map and so greatly relied upon in the majority opinion, it is clear that they were not placed there by the original subdividers in 1887, for Mr. Holmquist testified:

"Q. But all of the iron stakes shown on this map of yours, marked Plaintiffs' Exhibit 'D', *you know you put them in yourself?* A. *Yes, sir.* (emphasis supplied)

We concede that had the lots been staked out simultaneously with the survey in 1888, and that fact could now be established, the purchasers would have a right to rely thereon even though thereafter a discrepancy was discovered. See Arnold v. Hanson, 91 Cal.App.2d 15, 204 P.2d 97.

But that is a far cry from the facts in the instant case where the stakes were admittedly placed by Mr. Holmquist some three decades after the subdivision was platted.

The hiatus or squeeze play resulting from the impact of these conflicting surveys, Jones and Holmquist, amounting to about half the width of a lot (actually .27.35 feet) becomes manifest with the instant controversy. If the Holmquist map is accepted the lot lines are shifted north by that distance and defendants' new brick residence is partially upon appellants' ground. On the other hand if what the trial court considered to be the true measurement is adopted then the appellees have the land called for in their deed and decreed to them by the judgment of the trial court.

In the specially concurring opinion it is stated as a fact: " * * * The plat (official plat of Grand Avenue Addition) further shows that Cedar Street * * *, if projected, the side lines thereof would be superimposed upon the side lines of Magnolia Street to the west of Grand Avenue." .yet, Engineer Harry E. Jones, whose testimony was evidently accepted by the trial court, testified on cross examination direct-.ly to the contrary. We quote:

"Q. Now showing you the photostatic copy of the official recorded map, I will call .your attention to Cedar Street and Mag-.nolia. A. Yes, sir.

"Q. They line up together, do they? A. No.

"Q. It appears to be so, does it not? A. Well, an optical illusion, but they actually don't for the simple reason that these blocks lying west of Grand Avenue were spaced off, beginning from the south line of the northwest portion, the blocks lie on the northeast side of Grand Avenue and were spaced off beginning at McDowell Road. Those streets, while they may appear to come to a common intersection of Grand Avenue, actually they don't.

"Q. In other words, what it shows here Magnolia and Cedar Street running through there is an optical illusion? A. They don't exactly coincide. Neither does Elm Street coincide exactly with Spruce Street west of Grand Avenue.

Even though other evidence in the record, such as a visual inspection of the Dyer map made in 1887, might be somewhat in conflict therewith, we might ask: have we become the triers of the fact? Under this state of the record can it be properly said that "the side lines of Cedar Street are in legal effect a permanent monument * * * from which the location of lots in block 31 may be definitely determined."? Our answers to both queries are, of course, in the negative.

We agree with the majority that the controlling plat in the instant case is that of Grand Avenue Addition (1888) which plat comprises *all* of the Northwest Quarter

of Sec. 6, Twp. 1 N. Range 3 E. of the G. & S. R. B. & M. Unfortunately the official map, other than stating it is drawn to a scale of 300 feet to an inch, is without original scale dimensions. That omission, however, is for our purposes supplied by the admission of all parties that the lots in blocks 30, 31, 32 and 33 (on the east side of the subdivision) as shown on the plat are fifty feet in width (except lot 15, block 30) and the streets shown thereon have a width of sixty feet, plus 33 feet for the south half of McDowell Road. With these dimensions conceded no uncertainty remains, hence we may invoke the rule stated in 8 Am.Jur., Boundaries, Sec. 6: " * * * It is a general rule that a description of premises is deemed certain if it may be made certain. * * * "

Furthermore, we find it to be the law that: " * * * whenever a deed describes property by reference to a plat or map, the grantor is considered as having adopted the plat or map as a part of the deed, and the grantee takes title in accordance with the boundaries so identified. * * * An allotment made by reference to a plan which indicates with certainty the location of every lot, although none of the boundary lines may have been actually run or located, will be sufficient if the lots can be surveyed and made certain; * * * ." 8 Am.Jur., Boundaries, Sec. 8.

We challenge the correctness of the oft repeated statements of the majority to the effect that the Grand Avenue Addition was not originally surveyed or platted with reference to governmental corners on the exterior lines of section 6, and more particularly with reference to the quarter section corner on the north at the intersection of what is now McDowell Road and Fifteenth Avenue. As a matter of fact the majority are in disagreement among themselves as to this matter of an original survey—Justice STANFORD stating: " * * * It further appears from the evidence that the *monuments from which the original survey was made* cannot be accurately located. * * * " (Emphasis supplied) whereas Justice Phelps in the specially concurring opinion holds that: "So far as the evidence in this case discloses *there was never made an actual survey of Grand Avenue Addition, * * * .*" (Emphasis supplied)

Obviously both cannot be right. It seems to us that the latter statement is completely refuted by the dedication appearing upon the face of the original recorded plat of the subdivision, which reads in part: "This plat of the lots, streets and alleys *is hereby published as the complete plan and survey thereof,* and the said streets and alleys upon the recording hereof in the County Recorder's office are dedicated to the public for their use limited as herein set out. * * * (emphasis supplied)

Indicative of the ancientness of this plat is that it limited the use of Grand Avenue *"to light vehicles and such as are drawn by not more than two animals."* Would the majority have us believe that the official

plat showing in great detail more than a dozen streets (including more than two-thirds of a mile of Grand Avenue), 33 blocks and more than 700 lots which occupy all of the NW¼ of Sec. 6, was made with no established control points? The idea to us is preposterous. In 11 C.J.S., Boundaries, § 104 a (3) it is said:

" * * * It is not to be presumed that a surveyor knowingly made a description for lands which would be impossible to run out according to any recognized rules of surveying. * * *

* * * * * *

" * * * In the absence of evidence to the contrary, it will be presumed that the surveyor actually went on the ground in locating his lines, and corners, * * *."

We agree with Justice STANFORD that an original survey was made of this subdivision but emphatically disagree, for the reasons hereinafter stated, that the monuments from which the original survey was made cannot now be accurately located. From the maps in evidence it appears that the government quarter section corner is now marked by a cross in the pavement at the McDowell intersection. Both engineers, Jones and Holmquist, confirmed this fact. The latter testified on cross examination:

"Q. Now have those quarter section corners of the Northwest Quarter of 6, Township 1 North, Range 3 East, have they always been marked? A. Well, it has been marked ever since I have been in Phoenix.

"Q. How long is that? A. About 38 years.

"Q. And there is no dispute over those quarter section corners? A. Not that I know of." (emphasis supplied)

We may safely take judicial notice that the government survey of the township in question (which always includes the establishment of section and quarter section corners on the external bondaries of each section) was made prior to the time when the Grand Avenue Addition plat was filed as reference is thereon made to a legal subdivision of a surveyed section viz: NW¼, Sec. 6, T. 1 N., R. 3 E. Furthermore there is considerable sanctity to these monuments for it has always been a federal offense to destroy, change or remove to another place any section or quarter section corner on any government line of survey. See Sec. 1858, 18 United States Code Annotated.

The majority of the court, in reversing the judgment, is placed in this embarassing dilemma. They have two, nay three, control points from which they say the surveyor may proceed i. e., the Newcomb "partition fence" between lots 8 and 10, or the "side lines of Cedar Street"—take your choice—which govern (as they maintain) the east-west boundary lines between the lots. Yet in determining the equally important north-south line, being the east boundary line of the lots in question. Engineer Holmquist—upon whom, from an engineer-

120

ing standpoint, appellants' case rests—adopted as the third control point the identical quarter section corner now rejected by this court as being non-controlling. We quote excerpts from his testimony:

"Q. Now what other monuments did you tie into? A. The north quarter corner of the section for the same purpose.

"Q. The north quarter corner of the section? A. You might call that the northeast corner of the North west Quarter.

"Q. The northeast corner of the Northwest Quarter, that is the one at the center of McDowell? A. Yes, sir.

"Q. You tied into that on your survey? A. Tied into that line, yes, sir, the line connecting those two points.

"Q. I understood you to say you didn't go that far with your survey. A. You had to get that line to get the east boundary of the blocks.

"Q. And did you tie in then to the quarter corner up there. A. I don't recall whether I measured up there or not. We used this as a line. * * *"

We contend that if this monument was valid for such purpose it was valid for all purposes. In a situation of this kind there can be but one control point, not two or more conflicting ones.

Obviously the trial court took the view, and so do we, that in examining and construing the official plat of Grand Avenue Addition covering all, not a part, of the northwest quarter of said section 6, the only legal inference to be drawn therefrom was that the subdivision conformed to the governmental survey of the area and that therefore the quarter section corner was the one and only controlling monument from which disputed boundary lines could properly be determined.

Part of our difficulty can be resolved if the question as to who carries the burden of proof on this original monument matter is analyzed. It seems to be the view of the majority that it was incumbent upon the appellees (defendants) to affirmatively establish—after a lapse of 59 years, with participants probably all dead—that when the Grand Avenue Addition plat was prepared that it was laid off and measurements were taken from the governmental quarter section corner on the north line of section 6. We deny this premise and point out that appellants were the plaintiffs in the court below and hence the burden was upon them of showing that the government survey corners had been moved in the interim or that the subdivision was not laid out in accordance with the official survey of said section 6. From 11 C.J.S., Boundaries, § 104(b), Burden of Proof, these excerpts are taken:

" * * * proof of a change of boundary is on the party asserting that fact * * *.

* * * * * *

"As to surveys. One claiming under a survey, *or disputing the accuracy of a sur-*

*vey,* has the burden of proving the truth of his contention. * * * "

As a matter of fact this precise narrow question came from the fertile minds of our associates as it was not made an issue in the lower court and no testimony either pro or con appears in the record.

As an abstract proposition we have no quarrel with the principle of law announced in Silsby & Co. v. Kinsley, supra, relied upon the majority, to the effect [89 Vt. 263, 95 A. 638]: "The actual location upon the ground of original lot lines will control, if capable of being ascertained; but, when such lines have never been surveyed or, if surveyed, their location upon the ground cannot be ascertained, resort may be had to the lines of adjacent lots to determine their location."

It is our position that under the law and the facts of this case as we have detailed them this principle of law has no application for the reason that the surveyors are able to definitely fix the true monument from which the original survey of Grand Avenue Addition was made and thus ascertain the true location upon the ground of said lots. In other words, as we view it there are no lost, obliterated or destroyed monuments to deal with in this case. There is no occasion therefore for us to analyze the various cases cited by the majority.

It is our view that under the record of this case it may be conclusively presumed —there being no evidence to the contrary—

that the Grand Avenue Addition was laid out in accordance with the government survey of the area which it embraces. If we are correct in this conclusion that the government quarter section corner is the proper control point for an accurate survey then it indubitably follows the trial court was correct in finding in effect that: (1) it was precisely 1503 feet south from this established corner to the true boundary line between lots 6 and 8; (2) the Jones survey of the boundaries of appellees' lot 6 is correct; and (3) no portion of the six room residence appellees erected thereon encroaches upon appellants' lot 8. It is now conceded by the court's majority, at least we so interpret their statements that the Jones survey was correct if the government monument controls, and hence we shall not labor the point by marshalling the evidence which so overwhelmingly establishes the correctness of the trial court's findings in this regard.

To accept the decision of the majority in its full import will cast grave doubt upon, (a) the accuracy of the survey of all lots lying north of lot 10, block 31, Grand Avenue Addition, (b) the validity of the paving and other assessments levied by the City of Phoenix in the area, and (c) the abandonment of Elm Street and the establishment of the alley way therein.

For the reasons herein stated we would affirm in all particulars the judgment of the lower court.

DE CONCINI, J., concurs.